IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF MICHIGAN
DETROIT DIVISION

| | | |
|---|---|---|
| CHARTER TOWNSHIP OF CLINTON POLICE AND FIRE RETIREMENT SYSTEM, Individually and on Behalf of All Others Similarly Situated, | ) ) ) ) | |
| | ) | Civ. No. |
| Plaintiff, | ) ) | |
| vs. | ) ) | |
| VOLKSWAGEN AG, VOLKSWAGEN GROUP OF AMERICA, INC., MARTIN WINTERKORN, MICHAEL HORN, SCOTT KEOGH, JONATHAN BROWNING, MARK McNABB, JAN BURES,  and HERBERT DIESS | ) ) ) ) ) | CLASS ACTION
DEMAND FOR JURY TRIAL |
| Defendants. | | |

**CLASS ACTION COMPLAINT FOR VIOLATION
OF THE FEDERAL SECURITIES LAWS**

By and through the undersigned counsel, plaintiff Charter Township of Clinton Police and Fire Retirement System ("Plaintiff") alleges the following against Volkswagen AG ("Volkswagen" or the "Company"), Volkswagen Group of America, Inc. ("Volkswagen America") and certain of their executive officers (the "Individual Defendants").  Plaintiff makes these allegations upon personal knowledge as to those allegations concerning Plaintiff and, as to all other matters, upon the investigation of counsel, which included, without limitation: (a) review and analysis of public filings made by Volkswagen and other related parties and non-parties with the U.S. Securities and Exchange Commission ("SEC"); (b) review and analysis of press releases and other publications disseminated by certain of the defendants and other related non-parties; (c) review of announcements, filings and determinations of state and federal regulatory agencies; (d) review of news articles, shareholder communications and postings on

Volkswagen's website concerning the Company's public statements; and (e) review of other publicly available information concerning Volkswagen and the Individual Defendants.

## NATURE OF THE ACTION

1.     This is a federal securities class action against Volkswagen, Volkswagen America and certain of their officers and/or directors for violations of the federal securities laws.  Plaintiff brings this action on behalf of all persons or entities who purchased shares of Volkswagen ordinary and/or preferred American Depositary Receipts ("ADRs") of Volkswagen AG between November 19, 2010 and September 21, 2015, inclusive (the "Class Period"), seeking to pursue remedies under the Securities Exchange Act of 1934 (the "Exchange Act"), 15 U.S.C. §§78j(b) and 78t(a), and Rule 10b-5, 17 C.F.R. §240.10b-5, promulgated thereunder by the SEC.

2.     Volkswagen is one of the largest automobile manufacturers in the world.  The Company is headquartered in Wolfsburg, Germany and sells vehicles in 153 countries. Volkswagen is the parent company of twelve brands, including Audi, Volkswagen, Bentley, SEAT, SKODA, Porsche, Lamborghini, Scania, MAN and Ducati.  Volkswagen is the largest manufacturer of automobiles in Europe, but Volkswagen also has a strong presence in the United States, with a market share of 70% of all diesel cars sold in the United States.

3.     Volkswagen operates Volkswagen America, which is incorporated under the laws of New Jersey and headquartered in Herndon, Virginia, as a wholly-owned U.S. subsidiary.  For years, Volkswagen America's corporate headquarters were located in Auburn Hills, Michigan. Through 6,500 employees and a network of more than 1,000 dealers, Volkswagen America sells its vehicles in every U.S. state.

4.     At all times during the Class Period, defendants issued numerous false and misleading statements and material omissions to investors concerning the engines used in Volkswagen's Turbo Diesel vehicles ("TDI Vehicles").  Defendants claimed that the TDI

Vehicles were low polluting, fuel efficient and powerful.  However, these apparent qualities were the result of fraud:

> Volkswagen had been using, at all times throughout the Class Period, software designed to alter vehicle emissions during testing (the "Defeat Device"), which made the TDI Vehicles appear compliant as well as display higher than normal power and fuel economy.

5.      The U.S. Environmental Protection Agency ("EPA") is statutorily empowered to enforce laws limiting the discharge of pollutants.  The EPA enforces several of these laws, one of which is the Clean Air Act (the "CAA"). The CAA "requires every engine and motor vehicle within the chain of commerce in the United States to meet a set of emission standards and conformity requirements."  Volkswagen is subject to the CAA and numerous other regulations concerning the discharge of environmental pollutants by its vehicles.

6.      Defendants violated the CAA by using Defeat Devices in the TDI Vehicles, while simultaneously promoting the TDI Vehicles to customers and investors as compliant with all applicable laws.  Defendants falsely stated that the TDI Vehicles were environmentally friendly, fuel efficient and powerful. In reality, this was only achieved by using Defeat Devices to cheat emissions tests.  Based on these false statements and the use of Defeat Devices, defendants were able to substantially increase the sales of TDI Vehicles and the profitability of the Company.

7.      On September 18, 2015, the EPA issued a Notice of Violation (the "NOV") to Volkswagen for using their Defeat Device in violation of the CAA, revealing defendants' fraud to the investing public for the first time.  The NOV described defendants' violation as well as specific details regarding the design and operation of the Defeat Device.  The NOV also referenced events and earlier studies on which its findings were based.  As revealed in the NOV, the Defeat Device is composed of highly advanced software embedded into the main computer controlling the vehicle.  The software is paired with an algorithm that allows it to detect exactly

- 3 -

when regulators are performing emissions testing on the vehicle.  When the algorithm detects such testing, the software engages the emissions controls.  However, at all other times, the emissions systems are not activated or are activated in a greatly diminished capacity, thereby allowing the vehicles to obtain better fuel economy and performance.  Defendants' use of the Defect Device operated to give the impression that TDI Vehicles were low-polluting while efficient and powerful.  Yet as the NOV made clear, this impression was false, and defendants' use of the Defeat Device is a direct violation of the CAA.

8.      Over the course of the days and weeks following the release of the NOV, new details of defendants' fraud came to light through admissions of Company executives, releases by regulators and via media investigations, including that Volkswagen had suspended numerous top engineers close to the Company's Chief Executive Officer ("CEO"), Martin Winterkorn; Volkswagen America's CEO and President, Michael Horn, testified before Congress that he was aware of the emissions issues of the diesel engines at least as far back as the Spring of 2014; the Company has set aside reserves of more than $7 billion – though it has conceded that this amount will be insufficient for the liability it faces; and additional cheating on emissions testing has emerged.

9.      In response, the price of Volkswagen ADRs declined dramatically, with ordinary ADRs falling $12.59 per ADR, or 33%, from a close of $38.03 per ADR on September 17, 2015, to $25.44 per ADR on September 22, 2015, and preferred ADRs falling $14.07 per ADR, from a close of $38.05 per ADR on September 17, 2015 to a close of $23.98 per ADR on September 22, 2015.

10.      Throughout the Class Period, defendants made false and/or misleading statements, as well as failed to disclose material adverse facts about the Company's business,

operations and prospects.  Specifically, defendants made false and/or misleading statements and/or failed to disclose: (i) that Volkswagen was intentionally and systematically cheating emissions tests through use of its Defeat Devices; (ii) material information regarding these illegal practices and various attempts to conceal the practices from regulators; (iii) material information regarding regulatory investigations of Volkswagen for violating applicable federal and state regulations and laws, including the CAA, and the State of California's investigation of Volkswagen; (iv) that the Company was in breach of provisions of the CAA and other applicable laws; (v) that the Company faced stringent monetary penalties for its noncompliance; and (vi) that, as a result of the above, the Company's financial statements were materially false and misleading at all relevant times.

11.     As a result of defendants' wrongful acts and omissions, and the resulting decline in the market value of the Company's ADRs, Plaintiff and the other Class members have suffered significant losses and damages.

## JURISDICTION AND VENUE

12.     The claims asserted herein arise under §§10(b) and 20(a) of the Exchange Act, 15 U.S.C. §§78j(b) and 78t(a), and Rule 10b-5 promulgated thereunder by the SEC, 17 C.F.R. §240.10b-5.

13.     This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. §1331 and §27 of the Exchange Act, 15 U.S.C. §78aa.

14.     Venue is proper in this District pursuant to 28 U.S.C. §1391(b) and §27 of the Exchange Act, 15 U.S.C. §78aa(c).  Substantial acts in furtherance of the alleged fraud or the effects of the fraud have occurred in this District.  Volkswagen America's corporate headquarters were located in Auburn Hills, Michigan during the relevant period, and Volkswagen America currently operates a corporate call center in Auburn Hills.

15.     In connection with the acts, transactions, and conduct alleged herein, defendants directly and indirectly used the means and instrumentalities of interstate commerce, including but not limited to the mails, interstate telephone communications, and the facilities of a national securities exchange.

## PARTIES

**Plaintiff**

16.     Plaintiff Charter Township of Clinton Police and Fire Retirement System, as set forth in the accompanying certification, incorporated by reference herein, purchased Volkswagen ADRs during the Class Period, and suffered damages as a result of the federal securities law violations and false and/or misleading statements and/or material omissions alleged herein.

## DEFENDANTS

17.     Defendant Volkswagen AG ("Volkswagen"), or Volkswagen Aktiengesellschaft, is a German-based automobile manufacturer headquartered in Wolfsburg, Lower Saxony, Germany. Volkswagen manages 12 automobile brands: Audi, Bentley, Bugatti, Ducati, Lamborghini, Porsche, SEAT, SKODA, Volkswagen (non-commercial vehicles), Volkswagen Commercial Vehicles, Scania and MAN.  In the first half of 2015, Volkswagen was ranked as the largest automobile manufacturer in the world.

18.     Volkswagen ADRs are sponsored by J.P. Morgan and trade in the United States on the over-the-counter ("OTC") market.  Volkswagen preferred ADRs trade under the symbol "VLKPY" and Volkswagen ordinary ADRs trade under the symbol "VLKAY."

19.     Defendant Volkswagen Group of America, Inc. ("Volkswagen America") is a New Jersey corporation that conducts business throughout all 50 U.S. states and the District of Columbia, including the operation of a sales and manufacturing division in Auburn Hills, Michigan and a manufacturing plant in Chattanooga, Tennessee that house Volkswagen's U.S.

operations including: Audi, Bentley, Bugatti, Lamborghini, Volkswagen and VW Credit, Inc. Volkswagen America also does business as Audi of America, Inc.

20.     Defendant Martin Winterkorn ("Winterkorn") served as, at all relevant times, CEO and Chairman of the Management Board for Volkswagen from January 1, 2007 until his resignation on September 23, 2015.

21.     Defendant Michael Horn ("Horn") has served as, and was at relevant times, CEO and President of Volkswagen America since January 1, 2014.  Horn also served as the Global Head of After Sales at Volkswagen and Volkswagen America from March 2009 to December 2013.

22.     Defendant Scott Keogh ("Keogh") has served as, and was at relevant times, the President of Audi of America since July 2012.  Keogh heads all of Audi's U.S. activities.

23.     Defendant Jonathan Browning ("Browning") served as, at relevant times, CEO and President of Volkswagen America from October 1, 2010 to December 31, 2013.

24.     Defendant Mark McNabb ("McNabb") has served as, at relevant times, Chief Operating Officer ("COO") of Volkswagen America since May 2013.  McNabb oversees the management of sales for Volkswagen.

25.     Defendant Jan Bures ("Bures") has served as, at all relevant times, the Executive Vice President Group After Sales and Services for Volkswagen America.  Bures is responsible for overseeing after-sales strategy, delivery of Volkswagen America parts turnover and profit, parts logistics, wholesale parts operations, contract centers and roadside assistance.

26.     Defendant Herbert Diess ("Diess") has served as, at relevant times, Volkswagen's Chairman of the Board of Management of the Volkswagen Passenger Cars Brand since July 1, 2015.

- 7 -

27.     Defendants Winterkorn, Horn, Keogh, Browning, McNabb, Bures and Diess are collectively referred to as the "Individual Defendants."

28.     The Company and the Individual Defendants are collectively referred to herein as "Defendants."

29.     During the Class Period, the Individual Defendants, as senior executive officers and/or directors of Volkswagen, were privy to confidential, proprietary and material adverse non-public information concerning Volkswagen, its operations and specifically its efforts to circumvent legal emissions requirements, via access to internal corporate documents, conversations and connections with other corporate officers and employees, attendance at management and/or board of directors meetings and committees thereof, and via reports and other information provided to them in connection therewith.  Because of their possession of such information, the Individual Defendants knew or recklessly disregarded that the adverse facts specified herein had not been disclosed to, and were being concealed from, the investing public.

30.     The Individual Defendants are liable as direct participants in the wrongs complained of herein. In addition, the Individual Defendants, by reason of their status as senior executive officers and/or directors, were "controlling persons" within the meaning of §20(a) of the Exchange Act, and had the power and influence to cause the Company to engage in the unlawful conduct complained of herein.  Because of their positions of control, the Individual Defendants were able to and did, directly or indirectly, control the conduct of Volkswagen's business.

## SUBSTANTIVE ALLEGATIONS

**Background**

31.     At the close of 2008, Volkswagen revealed an ambitious plan to sell a combined one million Volkswagens and Audis by 2018. On January 12, 2009, a news release stated: "The

Company has set a goal of selling one million Volkswagens and Audis by 2018, as part of the worldwide Volkswagen Group's focus on becoming an economic and environmental leader in the global automotive industry." At that time, Stefan Jacoby, President and CEO for Volkswagen America stated that Volkswagen was "optimistic for a bright future here in the U.S."

32. Defendants premised this "bright future" in large part on selling the American market diesel powered cars that were seemingly powerful, fuel efficient and clean. In August of 2008, for the first time, Volkswagen introduced its TDI clean diesel technology in the United States. An accompanying press release related that Volkswagen's "clean diesel technology . . . [was] proof of [Volkswagen's] commitment to provide customers an alternative in their purchase of fuel efficient, clean emissions vehicles that are also fun to drive." In 2009 Volkswagen sold 43,869 clean diesel vehicles and by 2013 that number skyrocketed to 111,285. This success was driven by Volkswagen's environmentally focused image.

33. The Company perpetuated this false and misleading image to great success. In June 2009, Volkswagen America's COO, Mark Barnes, touting the success of the Company's diesel sales, stated that "U.S. consumers are starting to realize the many benefits of today's clean diesels--vehicles that attain more than 30 percent better fuel economy while emitting 25 percent less greenhouse gas emission, all without sacrificing driving dynamics." Experts exalted Volkswagen's clean diesel engines as highlighted in a 2007 *Popular Mechanics* article entitled "2009 Volkswagen Jetta TDi Test Drive: Clean Diesel's 50 MPG Meets Prius-Humbling Thrust."

34. Volkswagen stated that it took "environmental responsibility very seriously," and made its cars as "green as possible." Volkswagen proclaimed that the Company built "the

world's cleanest diesel engines," explaining that "[l]ong range without sacrifice is the promise of TDI Clean Diesel," and "[t]hose old diesel realities no longer apply.  Enter TDI Clean Diesel. Ultra-low-sulfur fuel, direct injection technology, and extreme efficiency."

35.     Volkswagen's fraudulent claims were reinforced by industry accolades that it promoted on its website. In November 2008, the Volkswagen Jetta TDI won Green Car of the Year at the Los Angeles Auto Show.  This was followed in 2010 by the Audi A3 TDI winning Green Car of the Year.

36.     In mid-2015, Volkswagen reached its 2008 goal as it overtook Toyota to become the largest automaker in the world, fueled in part by sales of its clean diesel vehicles. Between 2009 and 2015, Volkswagen grew its sales considerably.  By 2015 Volkswagen had acquired a 70% market share of U.S. diesel-powered vehicle sales.

**Materially False and Misleading Statements Issued During the Class Period**

37.     Throughout the Class Period, in regular press releases and filings with the SEC, Defendants repeatedly made false and misleading statements and omissions concerning the Company's business practices and regulatory compliance.  Defendants repeatedly misrepresented that Volkswagen's TDI Vehicles had low emissions but high efficiency and power and that all of its vehicles were compliant with environmental regulations in the United States and elsewhere. Contrary to these statements, Defendants knew or should have known that Volkswagen's TDI technology was not "without compromise" regarding efficiency and emissions, but rather a fraudulent impression created by an illegal Defeat Device intentionally placed within the software of certain TDI Vehicles.

38.     On November 19, 2010, Volkswagen issued a press release entitled "Environmental Management Has a Long History at Volkswagen."  The press release stated the following, in pertinent part:

The Volkswagen technical development environmental management system has today been awarded its latest DIN EN ISO 14001 certificate from TUV NORD. The ISO/TR 14062 certification first achieved in 2009 has also been renewed. The standard stipulates binding conditions for the integration of environmental aspects into product design and development.

"***Volkswagen set itself the goal back in 1995 of achieving continuous improvements in the environmental compatibility of its products and production processes,***" *said Günter Damme, Head of Environment at Volkswagen.* "***The technical development environmental management system is the key to ensuring that each and every new Volkswagen is more environmentally friendly than its predecessor***."

39.     On January 4, 2011, Volkswagen America issued a press release entitled "Volkswagen of America Closes 2010 with Best Overall Year Sales Since 2003." The press release stated the following, in pertinent part:

Volkswagen of America, Inc. today reported that December 2010 marked a 17 percent increase over prior year sales for the entire line of vehicles. In addition, 2010 achieved a 20 percent increase over 2009 total year sales. Increased sales numbers resulted in best annual sales since 2003 and best December sales since 2005.

*             *             *

***Volkswagen's impressive line-up of TDI Clean Diesels fared well again in December with Golf selling 56 percent of its models as TDI and the all-new Touareg selling 35 percent as TDI. Overall, 22 percent of Volkswagen models were sold with TDI Clean Diesel engines.***

40.     On March 10, 2011, Volkswagen issued its Annual Report for the year ended December 31, 2010 ("2010 Annual Report"). The 2010 Annual Report stated the following, in pertinent part:

***Sustainably increasing the value of the Company is our most important task so as to safeguard the continued existence of the Volkswagen Group for the long term.*** The trust of our customers and investors is a fundamental condition. We gain this trust through transparent and responsible corporate governance, which takes the highest priority in our daily work.

41.     Volkswagen's 2010 Annual Report also represented the Company's corporate governance as follows:

> In accordance with the requirements of the German Corporate Governance Code, the Board of Management of the Volkswagen Group ensures that the statutory requirements and the Company's internal policies are complied with and respected throughout the Group. ***Volkswagen's sense of duty has always gone beyond statutory and internal requirements; obligations undertaken and ethical principles accepted voluntarily also form an integral part of our corporate culture and are at the same time the guiding principle on which we base our decisions. Our compliance activities are based on a Group-wide compliance strategy, which embraces a preventive approach.***

42.     On May 31, 2011, Volkswagen issued a press release entitled "US Department of Transportation Secretary Ray LaHood views Clean Diesel engines as a key component of future technology for highway transportation in the USA."  The press release stated the following, in pertinent part:

> ***High-tech Clean Diesel engines from Volkswagen are a cornerstone in the environmentally-friendly renewal of individual mobility in the United States.*** US Secretary of Transportation Ray LaHood focused on this Tuesday last week in his welcoming speech at the opening ceremony for Volkswagen's new plant in Chattanooga, Tennessee.  US Secretary of Transportation Ray LaHood emphasized that the USA finds itself in an era of transition towards a new form of mobility - and thanks to the innovative technologies of Volkswagen, clean diesel engines will play an important role in implementing a new powertrain strategy for the United States.  "And that is not only because it is the right engine for environmental and climate protection in the USA. Clean diesel engines also make sense economically, for both individuals and American companies. The Clean Diesel technology that is found in the new US Passat, for example, makes a genuine difference."
>
> *          *          *
>
> ***In April 2011, the diesel share of vehicles sold by Volkswagen of America was 24 per cent. This means that nearly one in every four Volkswagen brand cars delivered in the USA has a fuel-efficient and clean TDI engine.***  The Volkswagen Group is the global market leader in diesel engine technology, and back in 2008 it was the first carmaker to offer diesel vehicles on the US market that conformed to the BIN-5 standard, the most stringent emissions legislation in the world. In America, the Volkswagen brand already offers four TDI clean diesel models, and the Audi brand offers two. This year, the new Passat TDI and the Beetle TDI will be added. Audi has announced that it will bring the TDI to the

- 12 -

luxury class in the USA and offer TDI clean diesel engines in both the Audi A6 and Audi A8 in 2013.

*Many experts consider these diesel engines to be the most advanced combustion engines of our times. They combine minimum fuel consumption and the lowest emissions with maximum power.*  Depending on the specific model, Clean Diesel technologies may include an SCR catalytic converter - which reduces nitrogen oxide emissions (NOx) by up to 90 percent - or a NOx storage catalytic converter and oxidation catalytic converter, particulate filter, exhaust gas recirculation (EGR) and intelligent interventions by the electronic engine management system.

43.    On March 1, 2012, Volkswagen America issued a press release entitled "Volkswagen Reports 42.5 Percent Increase in February U.S. Sales."  The press release stated the following, in pertinent part:

Volkswagen of America, Inc. (VWoA) today reported 30,577 units sold in February, a 42.5 percent increase over prior year sales and best February since 1973.  "February's strong sales of 30,577 units and back-to-back record months reflects the increasing consumer confidence in the marketplace and strong interest for our products," said Jonathan Browning, President and CEO, Volkswagen Group of America, Inc. *"With escalating fuel prices, we anticipate increased demand for our full-range of fuel efficient vehicles, particularly our TDI Clean Diesel models, to continue into the spring selling season."*

The 2012 Beetle sold 1,303 units. The TDI Clean Diesel Coupe was unveiled this month at the Chicago Auto Show; it will go on sale late summer 2012.

\*    \*    \*

*Volkswagen's high-mileage, clean diesel TDI models accounted for 21.3 percent of sales in February, a 54.6 percent increase versus the prior month.*

44.    On March 12, 2012, Volkswagen released its Annual Report for the year ended December 31, 2011 ("2011 Annual Report").   In the Company's 2011 Annual Report, Defendants characterized 2011 as a "positive year" in part because:

Growth in sales to customers outperformed that of the market as a whole, allowing us to further strengthen our global market share.

*This positive performance is due above all to our attractive and environmentally friendly model portfolio, which excites customers around the globe. In addition, our high quality and efficiency standards helped us meet and even exceed our financial targets.*

- 13 -

45.     The Company's 2011 Annual Report also asserted the following:

As one of the largest mobility groups in the world, we take responsibility.  For our customers and employees. For our locations and society. **And for the environment.**

46.     The 2011 Annual Report also represented the following regarding social responsibility:

Our corporate policy is designed so that core economic processes are strategically tied to environmental and social concerns. [Corporate social responsibility] involves voluntarily taking social responsibility at a level beyond mere compliance with legal requirements. ***The Volkswagen Group's integrated [corporate social responsibility] concept is aimed at avoiding risks, identifying opportunities for development early on and improving the Group's reputation.***

47.     On October 2, 2012, Volkswagen America issued a press release entitled "Volkswagen Reports a 34.4 Percent Sales Increase in September."  The press release stated the following, in pertinent part:

Volkswagen of America, Inc. (VWoA) today reported 36,339 units sold in September, a 34.4 percent increase over prior year sales, a 37.2 percent increase year-to-date and the best September since 1972.

"Tracking over a 37 percent increase year-to-date is a strong proof point that ***our products are on more shopping lists and gaining acceptance in the market***," said Jonathan Browning, President and CEO, Volkswagen Group of America, Inc. "***As we enter the fourth quarter of the year, we expect to continue our pattern of outperforming the industry***."

*        *        *

***The Beetle continues to gain momentum with 2,622 units sold. The Beetle TDI, sold 167 units, further highlighting customer demand for Volkswagen's Clean Diesel TDI technology***.

48.     On January 3, 2013, Volkswagen America issued a press release entitled
"Volkswagen Reports 35.1% Percent Increase in 2012 U.S. Sales."  The press release stated the
following, in pertinent part:

> Volkswagen of America, Inc. (VWoA) today reported 438,133 units delivered in
> 2012, a 35.1 percent increase over prior year sales. December deliveries totaled
> 44,005, up 35.4 percent over 2011, marking the best December since 1970.
>
> "2012 marked another successful year of growth for Volkswagen of America,"
> said Jonathan Browning, President and CEO, Volkswagen Group of America, Inc.
> "***The Volkswagen brand delivered another important step in our long term
> growth plan. 2012 marked the third consecutive year of significant double-digit
> growth rates and we more than doubled our volume of 2009. With the addition
> of the all-new Jetta Turbo Hybrid, Beetle Convertible and our strong dealer
> network, we expect to continue to outpace the industry in 2013***."

49.     On March 1, 2013, Volkswagen America issued a press release entitled
"Volkswagen Reports 30th Consecutive Month of Sales Growth."  The press release announced
that "***Volkswagen's high-mileage, clean diesel TDI models accounted for 22.4 percent of sales
in February, a 10.9 percent increase over the prior year***."

50.     On March 14, 2013, Volkswagen released its Annual Report for the year ended
December 31, 2012 ("2012 Annual Report").  The press release announcing the 2012 Annual
Report asserted that:

> [Volkswagen is] continuing to focus on offering new, integrated and sustainable
> mobility solutions. Volkswagen Leasing GmbH now has a portfolio of some
> 216,000 environmentally friendly vehicles.  ***In addition, average CO2 emissions
> in all vehicle deliveries to fleet customers of Volkswagen Leasing have fallen by
> 12 percent in the past four years***.

51.     The 2012 Annual Report disclosed the following regarding corporate governance:

> The future of the Volkswagen Group depends on our ability to continually
> increase the Company's value.  ***Strengthening the trust of our customers and
> investors is fundamental to this. Transparent and responsible corporate
> governance therefore takes the highest priority in our daily work***.

52.    The 2012 Annual Report also stated the following:

Our outstanding team is dedicated to developing and manufacturing first-class automobiles that captivate customers around the world. The focus of our business is on ensuring responsibility and sustainability in respect of our employees, society and the environment along the entire value chain.

*    *    *

***Sustainability requires a commitment to balancing economic, ecological and social dimensions. Our CSR [corporate social responsibility] concept is aimed at ensuring that we avoid risks at every step along the value chain, identify opportunities for development early on and improve our reputation***. CSR therefore makes a necessary contribution to increasing the value of the Company and safeguarding it in the long term.

53.    The 2012 Annual Report also disclosed:

Increasing $CO_2$ and consumption regulations mean that the latest mobility technologies are required in all key markets worldwide.

***The Volkswagen Group closely coordinates technology and product planning with its brands so as to avoid target breaches***, which entail severe sanctions.

54.    On April 5, 2013, Volkswagen America issued a press release entitled "Volkswagen Spreads Diesel Gospel in Gotham."  The press release stated that "[a]s the tide of clean-diesel sales in the U.S. market slowly rises, Volkswagen executives are happy to talk about their company's seminal role in successfully reintroducing diesel-powered automobiles to the American-market mainstream."  The press release further stated that "***Volkswagen has been the leader of the mass-market re-introduction of diesel power to the U.S. market, while sibling brand Audi has taken the lead in the luxury segment. . . .  Diesel's fuel-efficiency advantage, as well as torque properties, make it an increasingly attractive choice for American consumers with a 'green' orientation who don't want hybrids or EVs***."

55.    On December 20, 2013, Volkswagen America issued a press release entitled "It's Official: Volkswagen Group of America Has Sold More Than 100,000 TDI® Clean Diesel Vehicles in 2013."  The press release announced that Volkswagen "has sold 100,000 TDI®

Clean Diesel vehicles from the Volkswagen and Audi brands this year.  This is the first time it has reached this milestone in a calendar year."  The press release further stated that "Audi and Volkswagen pioneered TDI® Clean Diesel engines and, as a result, the Volkswagen Group of America is the current market leader in Clean Diesel. Today's Clean Diesel engines deliver more torque, better highway fuel consumption and reduced $CO2$ emissions compared with equivalent gasoline engines."  In the press release, defendant McNabb was quoted as stating that "'[s]elling more than 100,000 TDI Clean Diesel vehicles is a significant milestone for Volkswagen Group of America. . . .  *We're excited to see the increasing numbers of customers able to enjoy the reliability, durability, fuel-efficiency and power of the clean diesel engine*.'"  Defendant Keogh was quoted as stating that "'[t]he past year has shown that American consumers clearly recognize the benefits of clean diesel TDI vehicles . . . .  They understand now more than ever that this is a technology delivering real answers to society's concerns about fuel consumption and greenhouse gas emissions without compromises.'"

56.  On January 3, 2014, Volkswagen America issued a press release entitled "Volkswagen Reports December 2013 and Year End Results."  The press release stated the following, in pertinent part:

> Volkswagen of America, Inc. (VWoA) today reported 407,704 units delivered in 2013. December deliveries totaled 34,015. Volkswagen's high-mileage, TDI® Clean Diesel models totaled 95,823 units for the year accounting for 23.5percent of sales in 2013 and 17.8 percent in December. Since 2000, Volkswagen of America has delivered over 500,000 TDI® Clean Diesel vehicles.

> "Volkswagen is now operating at a new plateau, delivering over 400,000 units for the second consecutive year in over 40 years," said Mark McNabb, chief operating officer, Volkswagen of America, Inc. "We look forward to 2014, with the introduction of the new Golf family, continued increased awareness and enthusiasm for the brand's core models and the strength of our TDI offerings, we are well positioned for our next phase of growth to come over the next few years."

> The Chattanooga-built Volkswagen Passat continues to demonstrate its strong appeal in the market with 9,254 units sold in December and 109,652 for the year.

Clean Diesel TDI Passat sales were the best year on record with 34,963 vehicles delivered, accounting for 32 percent of sales of the year.

57.     On March 6, 2014, Volkswagen America issued a press release entitled "Volkswagen Group of America Releases 2013 Corporate Social Responsibility Report."  In the press release, defendant Horn stated that "'***Volkswagen Group of America is united not only by our devotion to building quality vehicles, but also by our commitment to doing what's right for the environment***.'"  The release further asserted that "[c]utting-edge technologies have enabled Volkswagen to progress toward carbon-neutral vehicles," such as "TDI® clean diesel vehicles." The press release disclosed that "[i]n 2013, Volkswagen and Audi accounted for 75 percent of the U.S. market for clean diesel vehicle sales, enabling owners nationwide to achieve up to 30 percent improved fuel-economy compared to gasoline vehicles."

58.     On March 13, 2014, Volkswagen issued its Annual Report for the year ended December 31, 2013 ("2013 Annual Report").  The 2013 Annual Report stated the following, in pertinent part:

> ***Compliance is a cornerstone of sustainable business – a view expressly shared by the Company's management. Speaking to an audience of more than 5,000 at a management event in 2013, Chairman of the Board of Management of the Volkswagen Group, Prof. Dr. Martin Winterkorn, emphasized this point: "Operating a sustainable business means we continue to take the subject of compliance seriously. We do not break the law, or other rules and regulations! This applies to all of our brands and in all regions."***

59.     On March 18, 2014, Volkswagen America issued a press release regarding its latest version of its TDI clean diesel engine.  The press release stated the following in pertinent part:

> Douglas Skorupski, Manager of Technical Strategy, Volkswagen of America, today presented the launch details of the company's newest, most fuel-efficient, TDI® Clean Diesel engine, designated EA288.

*     *     *

"*The Volkswagen Group is a leader in Clean Diesel technology*," said Skorupski. "With the introduction of the new EA288 engine, we are excited that our family of TDI Clean Diesel vehicles *is continuing to improve and will be even cleaner and more fuel efficient and powerful. We're excited to see the increasing numbers of customers able to enjoy the reliability, durability, fuel efficiency and power of Clean Diesel engines*."

Ever since 1977, when Volkswagen first offered a diesel engine in the Rabbit, the company has sold more than one million cars and SUVs powered by these engines in the U.S. High-mileage, TDI® Clean Diesel Volkswagen models accounted for 24 percent of sales in 2013, the best result on record. *The TDI models in the Audi and Volkswagen lineup deliver up to 30 percent better fuel economy and 12-30 percent lower carbon dioxide emissions than comparable gasoline engines*.

60.   On May 16, 2014, Volkswagen issued a press release entitled "Volkswagen Group Receives World Environmental Center's 30th Anniversary Gold Medal Award for Sustainable Development in 2014."  The press release stated that Volkswagen was "deeply honored to be recognized by the World Environment Center for our endeavors to create a society where conservation and eco-mobility are truly standard practices, not the exception."  The press release stated that "Volkswagen's holistic approach to sustainability instills eco-conscious behaviors in all aspects of its operations.  This includes following a strong set of environmental principles when building cars - at every stage of a vehicle's lifecycle."  The press release further stated that "Volkswagen Group offers the largest low-C02 fleet in the global market, with high performing and efficient powertrain options, including TDI® Clean Diesel, Turbo Stratified Injection (TSI), hybrid, plug-in hybrid and electric."

61.   On January 5, 2015, Volkswagen America issued a press release entitled "Volkswagen Reports December 2014 Sales and 2014 Year-End Results."  The press release stated the following, in pertinent part:

Volkswagen of America, Inc. (VWoA) today reported 34,058 units delivered in December, with 366,970 units delivered in 2014.

- 19 -

"In 2014 Volkswagen of America enhanced the lineup of German-engineered vehicles with an all-new, award-winning Golf family, a refreshed Jetta and most recently a refined Touareg," said Mark McNabb, chief operating officer, Volkswagen of America. "As we kick off 2015, we are encouraged that the vehicles have been well received by both the automotive press and our dealers."

\*       \*       \*

Volkswagen's high-mileage, TDI® Clean Diesel models totaled 79,422 units for the year, accounting for 21.6 percent of sales in 2014. In December, 5,348 units were sold, 15.7 percent of sales.

62.     On March 13, 2015, Volkswagen issued its Annual Report for the year ended December 31, 2014 ("2014 Annual Report").  The 2014 Annual Report stated the following, in pertinent part:

> *We are focusing in particular on the environmentally friendly orientation and profitability of our vehicle projects so that the Volkswagen Group has the right products for success even in more challenging economic conditions. . . .  Our activities are primarily oriented on setting new ecological standards in the areas of vehicles, drivetrains and lightweight construction.*

\*       \*       \*

> *Thanks to its corporate culture, Volkswagen is better suited than almost any other company to combine a modern understanding of responsibility and sustainability with the traditional values of running a business to form an integrated [corporate social responsibility] approach.*

63.     On August 3, 2015, Volkswagen America issued a press release entitled "Volkswagen of America Reports July Sales Gain of 2.4 Percent Over July 2014."  The press release stated the following, in pertinent part:

> The all-new Golf family of vehicles continued to find success in the market. In July, Golf family sales totaled 6,717 units and the 2015 GolfTDI® Clean Diesel earned yet another accolade: a new GUINNESS WORLD RECORDS® achievement for the "lowest fuel consumption- 48 U.S. contiguous States for a non-hybrid car" with a remarkable 81.17 mpg.

64.     Defendants' statements above were materially false and misleading and failed to disclose: (i) that Volkswagen was intentionally and systematically cheating emissions tests

through use of its Defeat Devices and vehicles equipped with its TDI engines were emitting pollutants at up to 40 times allowable limits; (ii) material information regarding these illegal practices and various attempts to conceal the practices from consumers, regulators and investors; (iii) material information regarding regulatory investigations of Volkswagen for violating applicable federal and state regulations and laws, including the CAA, and the State of California's investigation of Volkswagen; (iv) that the Company was in breach of provisions of the CAA and other applicable laws; (v) that the Company faced stringent monetary penalties for its non-compliance; and (vi) that, as a result of the above, the Company's financial statements were materially false and misleading at all relevant times.

**The Truth Slowly Emerges**

65.     On September 18, 2015, the EPA issued the NOV to Volkswagen for violation of §203(a)(3)(B) of the CAA, 42 U.S.C. §7522(a)(3)(B), for using a Defeat Device in certain of its vehicles.  Specifically, the NOV explained that the Defeat Device, which was used in several vehicles for several model years, violated the CAA because it was designed to "bypass, defeat, or render inoperative elements of the vehicles' emission control system that exist to comply with the CAA emission standards."  Tellingly, the EPA noted that the software code displayed when the Defeat Device was in operation was hidden under the unassuming name of "dyno calibration."

66.     Also on September 18, 2015, several news outlets published stories about the violation.  For example, *The New York Times* published a story entitled "VW Is Said to Cheat on Diesel Emissions; U.S. to Order Big Recall," which stated that the United States had ordered the recall of "nearly half a million cars" involving several 4-cylinder Volkswagen and Audi vehicles from model years 2009-2015.  The article further stated that Volkswagen's Defeat Device "was

designed to conceal the cars' emission of the pollutant nitrogen oxide," and that, according to the EPA, the recall was merely "the opening salvo" in what was to come for Volkswagen.

67.     In response to these disclosures, Volkswagen ordinary ADRs declined 4.5%, from a close of $38.03 per ADR on September 17, 2015 to $36.31 per ADR on September 18, 2015, and preferred ADRs declined 4.2%, from a close of $38.05 per ADR on September 17, 2015 to $36.47 per ADR on September 18, 2015.

68.     On September 20, 2015, defendant Winterkorn issued a public statement on behalf of Volkswagen, stating that the EPA and California Air Resources Board ("CARB") "have detected manipulations that violate American environmental standards."   Defendant Winterkorn further stated that "Volkswagen AG takes these findings very seriously," that he was "deeply sorry that [Volkswagen has] broken the trust of our customers and the public," and that "[Volkswagen] will do everything necessary in order to reverse the damage this has caused." Defendant Winterkorn's statement was covered widely by the financial media, with feature articles appearing in *The Wall Street Journal*, *Forbes* and *Financial Times*.

69.     In response to defendant Winterkorn's statement, Volkswagen ordinary ADRs plummeted 17%, from a close of $36.31 per ADR on September 18, 2015 to $30.10 per ADR on September 21, 2015, and Volkswagen preferred ADRs declined over 18%, from a close of $36.47 per ADR on September 18, 2015 to $29.77 per ADR on September 21, 2015.

70.     On September 22, 2015, defendant Volkswagen issued an official statement which confirmed the EPA's findings.   The release stated that the Company was "working at full speed to clarify irregularities concerning a particular software used in diesel engines," and that the "[d]iscrepancies relate to vehicles with Type EA 189 engines, involving some eleven million vehicles worldwide."   The statement also disclosed that Volkswagen had set aside €6.5 billion

(approximately $7.3 billion) for its wrongdoing.   Defendant Volkswagen's statement was covered extensively, including in an article published by *CNNMoney* entitled "Volkswagen scandal widens: $7.3 billion cost, 11 million cars."

71.     On the same day, Volkswagen America CEO Michael Horn admitted that "[Volkswagen] was dishonest, with EPA, the California Air Resources Board, and had 'totally screwed up.'"

72.     In response to these disclosures, the price of Volkswagen ADRs plummeted even further.   Volkswagen ordinary ADRs declined over 15%, from a close of $30.10 per ADR on September 21, 2015 to $25.44 per ADR on September 22, 2015, and preferred ADRs declined over 19%, from a close of $29.77 per ADR on September 21, 2015 to $23.98 per ADR on September 22, 2015.

**Additional Revelation of Defendants' Scheme and Wrongdoing**

73.     On September 25, 2015, *Bloomberg News* reported that Volkswagen headquarters in Wolfsburg, Germany sent engineers to Volkswagen's California emissions testing center to "tinker" with vehicles that failed to pass emissions tests.   After the German engineers worked on the failing vehicles, they would pass the emissions tests.   According to the article, the "criteria, outcomes and engineering of cars that missed emissions targets were overseen by managers at Volkswagen's base in Wolfsburg."

74.     On September 26, 2015, *The New York Times* reported that cheating on emissions tests solved several problems created by defendant Winterkorn's plan for Volkswagen to be the world's largest automaker.   According to the article, "[n]ot only were drivers rewarded with better mileage and performance, but the automaker also avoided more expensive and cumbersome pollution-control systems."

- 23 -

75.     On October 4, 2015, *The Wall Street Journal* reported that Volkswagen had suspended Ulrich Hackenberg and Wolfgang Hatz, two engineers who had been top aides to defendant Winterkorn before being put in charge of research and development at Volkswagen shortly after Winterkorn became CEO in January 2007.   The same day, *The New York Times* reported that in 2008, Volkswagen, realizing that its new diesel engine could not meet U.S. emissions standards, began installing the defeat device software instead of abandoning production of its expensive new engine.

76.     On October 8, 2015, defendant Horn testified before the United States House of Representatives Committee on Energy and Commerce, Subcommittee on Oversight and Investigations.  Horn testified that in its ongoing discussions with EPA and CARB, Volkswagen disclosed to the regulators that it had installed an additional emissions control device on certain diesel vehicles and had failed to tell EPA and CARB about the device before seeking the regulators' approval of the vehicles.  Horn also told the Subcommittee that most of the nearly 500,000 affected vehicles in the United States will need a "major fix," including hardware and software, to remedy Volkswagen's defeat device.  Additionally, Horn testified that he first became aware of "non-compliance" issues in Volkswagen diesel engines in the Spring of 2014. Following Horn's testimony, *The New York Times* reported that EPA and CARB were investigating a second emissions control device and that Volkswagen had withdrawn its applications for EPA and CARB approval of its 2016 4-cylinder diesel engines.  Horn conceded that "it's very hard to believe" that "senior-level corporate managers and administrators had no knowledge [of the defeat device] for years and years."

77.     On October 12, 2015, the credit rating agency Standard & Poor's ("S&P") downgraded Volkswagen's long-term debt rating to A- and could cut the rating "by up to two

more notches" in the future in the face of "wide-ranging negative credit consequences following its admission that it installed software designed to manipulate diesel engine exhaust emissions in 11 million vehicles."  S&P stated its belief "that VW's breach of US environmental law and potential other laws outside the US represents a significant reputational and financial risk to VW over the medium term."

78.     On October 14, 2014, German news magazine *Der Spiegel* reported that, according to external and internal investigations into Volkswagen's scheme, at least 30 Volkswagen managers were involved in the Company's emissions cheating scheme.

79.     On October 15, 2015, *The New York Times* reported that Volkswagen recalled all 8.5 million of the affected diesel vehicles in Europe.  After finding Volkswagen's plan to fix the affected vehicles insufficient, German regulators ordered Volkswagen to recall 2.4 million vehicles located in Germany.  Volkswagen, reacting to the German recall order, decided to recall the 8.5 million affected diesel vehicles in Europe.

80.     On October 19, 2015, *Reuters* reported that Volkswagen made several versions of its defeat device software over the 7 years that Volkswagen admitted to cheating on emissions tests.  According to the article, a Volkswagen manager and a U.S. official close to the investigation explained that Volkswagen altered the software for four different engine types it produced from 2008 to 2015.

81.     On October 20, 2015, *The Wall Street Journal* reported that Volkswagen had suspended another senior executive, Frank Tuch, in its investigation into the diesel emissions cheating scheme.  From 2010 until his suspension, Tuch was the head of quality control at Volkswagen.   Tuch previously headed Porsche's quality control and was recruited by

Winterkorn in 2010 to improve quality control at Volkswagen and "bring [Volkswagen] forward into the U.S.A."

82.     On October 21, 2015, Mathias Mueller, Volkswagen's new CEO, acknowledged that the €6.5 billion Volkswagen had allocated toward the costs of the diesel emissions scheme was insufficient.  Mueller stated that the €6.5 billion applied only to recall costs and that he could only speculate as to further costs.

83.     On October 22, 2015, the *Financial Times* reported that Volkswagen had suspended ten senior executives as part of its investigation into the diesel emissions cheating scheme.   In addition to Hackenberg, Hatz and Tuch, Volkswagen suspended Richard Dorenkamp, former head of technical development for lowest emissions engines, Falko Rudolph, former head of diesel engine development, and Heinz-Jakob Neusser, a management board member who had previously been responsible for engine development.

84.     On October 23, 2015, *The Guardian* reported, in an article titled "VW Emissions Scandal: Doubts Grow Over Winterkorn's Involvement," that in the Spring of 2014, the Volkswagen board, led by Winterkorn, discussed a letter from the EPA to the Company regarding problems with Volkswagen diesel emissions.

85.     On October 24, 2015, *The New York Times* reported that Winterkorn and other Volkswagen executives failed to notify at least three board members that Volkswagen had admitted its diesel emissions cheating scheme to the EPA and CARB.  During that time, from September 3, 2015 until September 18, 2015, Volkswagen's board was completing the terms of a contract extension for Winterkorn as CEO.  The three board members stated that they learned of the emissions cheating scheme from media reports at the same time they were considering the

Volkswagen executive committee's recommendation to extend Winterkorn's contract to act as CEO.

86.     On November 2, 2015, the EPA and CARB notified Volkswagen that the emissions control device installed on Volkswagen's other diesel engine – the V6 3.0-liter – was an illegal defeat device that had not been appropriately disclosed to the regulatory agencies.  In its letter to Volkswagen, EPA emphasized that based on the design of the software, "VW knew or should have known" that the software, which caused the engines to operate in a "temperature conditioning mode" during regulatory testing, was a defeat device.  This second Defeat Device was installed on approximately 10,000 vehicles, including the 2014 Volkswagen Touareg, 2015 Porsche Cayenne and 2016 Audi A6, A7, A8 and Q5 models.  On November 5, 2015, *The Wall Street Journal* reported that Volkswagen halted all U.S. sales of 2013 to 2016 model years equipped with V6 3.0-liter diesel engines.

87.     On November 3, 2015, Volkswagen announced that it had underreported the amount of carbon dioxide emissions and fuel use by approximately 800,000 of its vehicles, nearly 98,000 of which were gasoline-powered vehicles.  According to *The Wall Street Journal*, Volkswagen estimated its financial risk from this latest disclosure at €2 billion.

88.     On November 4, 2015, credit rating agency Moody's Investor Services downgraded Volkswagen's credit rating from A2 to A3 based on "mounting risks to Volkswagen's reputation and future earnings following its announcement on 3 November regarding irregularities in CO2 and fuel consumption levels for certain Volkswagen group vehicles, as well as fresh allegations from the US EPA on 2 November that defeat devices were also installed in certain Audi, Porsche and Volkswagen Touareg models in the US."

89.     On November 9, 2015, Fitch Ratings downgraded Volkswagen's long-term rating from A to BBB+ and its short-term rating to F2 from F1 to reflect "the corporate governance, management and internal control issues highlighted by the ongoing emission test crisis related to up to 11 million diesel-powered vehicles."

## CLASS ACTION ALLEGATIONS

90.     Plaintiff brings this action as a class action pursuant to Federal Rule of Civil Procedure 23(a) and (b)(3) on behalf of a class consisting of all those who purchased Volkswagen's ordinary and/or preferred ADRs between November 19, 2010 and September 21, 2015, inclusive (the "Class Period"), and who were damaged thereby (the "Class").  Excluded from the Class are Defendants and their families, the officers and directors of the Company, at all relevant times, members of their immediate families and their legal representatives, heirs, successors or assigns and any entity in which Defendants have or had a controlling interest.

91.     The members of the Class are so numerous that joinder of all members is impracticable.  While the exact number of Class members is unknown to Plaintiff at this time and can only be ascertained through appropriate discovery, Plaintiff believes that there are hundreds or thousands of members in the proposed Class. Record owners and the other members of the Class may be identified from records maintained by Volkswagen, its transfer agent, J.P. Morgan, securities brokerages, or other sources, and may be notified of the pendency of this action by mail, using the form of notice similar to that customarily used in securities class actions.

92.     Plaintiff's claims are typical of the claims of the other members of the Class as all members of the Class are similarly affected by Defendants' wrongful conduct in violation of federal law that is complained of herein.

- 28 -

93.     Plaintiff will fairly and adequately protect the interests of the members of the Class and has retained counsel competent and experienced in class and securities litigation.

94.     Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class. Among the questions of law and fact common to the Class are:

(a)     whether the federal securities laws were violated by Defendants' acts as alleged herein;

(b)     whether Defendants participated in and pursued the common course of conduct complained of herein;

(c)     whether documents, press releases, and other statements disseminated to the investing public and the Company's shareholders during the Class Period misrepresented material facts about the business, finances, financial condition and prospects of Volkswagen;

(d)     whether statements made by Defendants to the investing public during the Class Period omitted and/or misrepresented material facts about the business, operations and prospects of Volkswagen;

(e)     whether the market prices of Volkswagen ADRs during the Class Period were artificially inflated due to the material misrepresentations and failures to correct the material misrepresentations complained of herein; and

(f)     to what extent the members of the Class have sustained damages and the proper measure of damages.

95.     A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable.  Furthermore, as the damages suffered by individual Class members may be relatively small, the expense and

- 29 -

burden of individual litigation make it impossible for members of the Class to individually redress the wrongs done to them.  There will be no difficulty in the management of this action as a class action.

## UNDISCLOSED ADVERSE FACTS

96.     The market for Volkswagen ADRs was open, well-developed and efficient at all relevant times.  As a result of these materially false and/or misleading statements, and/or failures to disclose, Volkswagen ADRs traded at artificially inflated prices during the Class Period. Plaintiff and the other members of the Class purchased or otherwise acquired Volkswagen ADRs relying upon the integrity of the market prices of the Company's ADRs and market information relating to Volkswagen, and have been damaged thereby.

97.     During the Class Period, Defendants engaged in a scheme to defraud and materially misled the investing public, thereby inflating the prices of Volkswagen ADRs, by utilizing the Defeat Devices in its diesel engines and publicly issuing false and/or misleading statements and/or omitting to disclose material facts necessary to make Defendants' statements, as set forth herein, not false and/or misleading.  Said statements and omissions were materially false and/or misleading in that they failed to disclose material adverse information and/or misrepresented the truth about Volkswagen's business, operations and prospects as alleged herein.

98.     At all relevant times, the material misrepresentations and omissions particularized in this Complaint directly or proximately caused or were a substantial contributing cause of the damages sustained by Plaintiff and the other members of the Class.  As described herein, during the Class Period, Defendants engaged in a scheme to defraud and made or caused to be made a series of materially false and/or misleading statements about Volkswagen's financial well-being and prospects.

99.    These material misstatements and/or omissions had the cause and effect of creating in the market an unrealistically positive assessment of the Company and its financial well-being and prospects, thus causing the Company's ADRs to be overvalued and their prices to be artificially inflated at all relevant times.  Defendants' scheme to defraud and materially false and/or misleading statements during the Class Period resulted in Plaintiff and the other members of the Class purchasing the Company's ADRs at artificially inflated prices, thus causing the damages complained of herein.

**LOSS CAUSATION**

100.    During the Class Period, as detailed herein, Defendants engaged in a scheme to deceive the market and a course of conduct that artificially inflated the prices of Volkswagen ADRs and operated as a fraud or deceit on Class Period purchasers of Volkswagen ADRs by failing to disclose to investors that the Company's financial results were materially misleading and misrepresented material information.  When Defendants' misrepresentations and fraudulent conduct were disclosed to the market, the prices of Volkswagen ADRs fell precipitously as the prior inflation came out of the Company's ADRs prices.  As a result of their purchases of Volkswagen ADRs during the Class Period, Plaintiff and the other Class members suffered economic loss, *i.e.* damages, under the federal securities law.

101.    Because of Defendants' failure to disclose the true state of the Company's diesel engines and lack of regulatory compliance, investors were not aware of the true state of the Company's financial status.   Therefore, Defendants presented a misleading picture of Volkswagen's regulatory compliance, financial health and future business prospects.   Thus, instead of disclosing during the Class Period the truth regarding the Company's actual emissions and regulatory compliance, Defendants caused Volkswagen to conceal the truth.

- 31 -

102.    Defendants' false and misleading statements caused Volkswagen ADRs to trade at artificially inflated prices throughout the Class Period.  However, as a direct result of the Company's problems coming to light, the prices of Volkswagen ADRs fell precipitously from their Class Period highs.  The drop in the prices of Volkswagen ADRs discussed herein caused real economic loss to investors who purchased the Company's ADRs during the Class Period.

103.    The decline in the prices of Volkswagen ADRs after the truth came to light was a direct result of the nature and extent of Defendants' fraud finally being revealed to investors and the market.  The timing and magnitude of the Volkswagen ADR price declines negates any inference that the loss suffered by Plaintiff and the other Class members was caused by changed market conditions, macroeconomic or industry factors or Company-specific facts unrelated to Defendants' fraudulent conduct.  The economic loss suffered by Plaintiff and the other Class members was a direct result of Defendants' fraudulent scheme to artificially inflate the prices of Volkswagen ADRs and the subsequent decline in the value of Volkswagen ADRs when Defendants' prior misrepresentations and other fraudulent conduct were revealed.

## SCIENTER ALLEGATIONS

104.    As alleged herein, the Defendants acted with scienter in that they knew that the public documents and statements issued or disseminated in the name of the Company during the Class Period were materially false and misleading; knew that such statements or documents would be issued or disseminated to the investing public; and knowingly and substantially participated or acquiesced in the issuance or dissemination of such statements or documents as primary violations of the federal securities laws.

105.    As set forth herein, the Individual Defendants, by virtue of their receipt of information reflecting the true facts regarding Volkswagen, their control over, receipt and/or modification of Volkswagen's allegedly materially misleading statements and omissions, and/or

- 32 -

their positions with the Company which made them privy to confidential information concerning Volkswagen, participated in the fraudulent scheme alleged herein.

106.   The ongoing fraudulent scheme described herein could not have been perpetrated over a substantial period of time, as has occurred, without the knowledge and complicity of the personnel at the highest level of the Company, including the Individual Defendants.

### APPLICABILITY OF PRESUMPTION OF RELIANCE: (FRAUD-ON-THE-MARKET DOCTRINE)

107.   At all relevant times, the market for Volkswagen ADRs was an efficient market for the following reasons, among others: (a) Volkswagen regularly communicated with public investors via established market communication mechanisms, including through regular dissemination of press releases on the national and international circuits of major newswire services, and through other wide ranging public disclosures, such as communications with the financial press and other similar reporting services; and (b) Volkswagen was followed by securities analysts employed by brokerage firms who wrote reports about the Company, and these reports were distributed to the sales force and certain customers of their respective brokerage firms.   Each of these reports was publicly available and entered the public marketplace.

108.   As a result of the foregoing, the market for Volkswagen ADRs promptly digested current information regarding Volkswagen from all publicly available sources and reflected such information in the prices of Volkswagen ADRs.   Under these circumstances, all purchasers of Volkswagen ADRs during the Class Period suffered similar injury through their purchase of Volkswagen ADRs at artificially inflated prices and a presumption of reliance applies.

109.   A Class-wide presumption of reliance is also appropriate in this action under the Supreme Court's holding in *Affiliated Ute Citizens of Utah v. United States*, 406 U.S. 128

(1972), because Plaintiff's fraud claims are grounded in Defendants' omissions of material fact of which there is a duty to disclose.  As this action involves Defendants' failure to disclose material adverse information regarding Volkswagen's business practices, financial results and condition and internal controls – information that Defendants were obligated to disclose during the Class Period but did not – positive proof of reliance is not a prerequisite to recovery.  All that is necessary is that the facts withheld be material in the sense that a reasonable investor might have considered such information important in the making of investment decisions.

## NO SAFE HARBOR

110.    The federal statutory safe harbor provided for forward-looking statements under certain circumstances does not apply to any of the allegedly false statements pleaded in this Complaint.  The statements alleged to be false and misleading herein all relate to then-existing facts and conditions.  In addition, to the extent certain of the statements alleged to be false may be characterized as forward looking, they were not identified as "forward-looking statements" when made and there were no meaningful cautionary statements identifying important factors that could cause actual results to differ materially from those in the purportedly forward-looking statements.

111.    In addition, Defendants are liable for those false forward-looking statements because at the time each of those forward-looking statements was made, the speaker had actual knowledge that the forward-looking statement was materially false or misleading, and/or the forward-looking statement was authorized or approved by an executive officer of Volkswagen who knew that the statement was false when made.

**COUNT I**

**For Violation of §10(b) of the Exchange Act
and Rule 10b-5 Promulgated Thereunder Against Defendants**

112.    Plaintiff repeats and realleges the allegations set forth above as though fully set forth herein. This claim is asserted against all Defendants.

113.    During the Class Period, Defendants, and each of them, carried out a plan, scheme and course of conduct that was intended to and, throughout the Class Period, did: (i) deceive the investing public, including Plaintiff and the other Class members, as alleged herein; (ii) artificially inflate and maintain the market prices of Volkswagen ADRs; and (iii) cause Plaintiff and the other members of the Class to purchase Volkswagen ADRs at artificially inflated prices. In furtherance of this unlawful scheme, plan and course of conduct, Defendants, and each of them, took the actions set forth herein.

114.    The Defendants: (a) employed devices, schemes, and artifices to defraud; (b) made untrue statements of material fact and/or omitted to state material facts necessary to make the statements not misleading; and (c) engaged in acts, practices and a course of business that operated as a fraud and deceit upon the purchasers of the Company's ADRs in an effort to maintain artificially high market prices for Volkswagen ADRs in violation of §10(b) of the Exchange Act and Rule 10b-5.  Defendants are sued as primary participants in the wrongful and illegal conduct charged herein.  The Individual Defendants are also sued herein as controlling persons of Volkswagen, as alleged herein.

115.    Defendants, individually and in concert, directly and indirectly, by the use of means or instrumentalities of interstate commerce and/or of the mails, engaged and participated in a continuous course of conduct to conceal adverse material information about the business, business practices, performance, operations and future prospects of Volkswagen as specified

herein. These Defendants employed devices, schemes and artifices to defraud, while in possession of material adverse non-public information and engaged in acts, practices, and a course of conduct as alleged herein in an effort to assure investors of Volkswagen's value, performance and substantial growth, which included the making of, or the participation in the making of, untrue statements of material facts and omitting to state material facts necessary in order to make the statements made about Volkswagen and its business, operations and future prospects, in light of the circumstances under which they were made, not misleading, as set forth more particularly herein, and engaged in transactions, practices and a course of business that operated as a fraud and deceit upon the purchasers of Volkswagen ADRs during the Class Period.

116.    Each of the Individual Defendants' primary liability, and controlling person liability, arises from the following facts: (i) each of the Individual Defendants was a high-level executive and/or director at the Company during the Class Period; (ii) each of the Individual Defendants, by virtue of his responsibilities and activities as a senior executive officer and/or director of the Company, was privy to and participated in the creation, development and reporting of the Company's operational and financial projections and/or reports; (iii) the Individual Defendants enjoyed significant personal contact and familiarity with each other and were advised of and had access to other members of the Company's management team, internal reports, and other data and information about the Company's financial condition and performance at all relevant times; and (iv) the Individual Defendants were aware of the Company's dissemination of information to the investing public that they knew or recklessly disregarded was materially false and misleading.

117.    The Defendants had actual knowledge of the misrepresentations and omissions of material facts set forth herein, or acted with reckless disregard for the truth in that they failed to ascertain and to disclose such facts, even though such facts were readily available to them. Defendants' material misrepresentations and/or omissions were done knowingly or recklessly and for the purpose and effect of concealing Volkswagen's operating condition, business practices and future business prospects from the investing public and supporting the artificially inflated prices of its ADRs. As demonstrated by their overstatements and misstatements of the Company's financial condition and performance throughout the Class Period, the Individual Defendants, if they did not have actual knowledge of the misrepresentations and omissions alleged, were severely reckless in failing to obtain such knowledge by deliberately refraining from taking those steps necessary to discover whether those statements were false or misleading.

118.    As a result of the dissemination of the materially false and misleading information and failure to disclose material facts, as set forth above, the market prices of Volkswagen ADRs were artificially inflated during the Class Period.  In ignorance of the fact that the market  prices of Volkswagen ADRs were artificially inflated, and relying directly or indirectly on the false and misleading statements made by Defendants, upon the integrity of the market in which the securities trade, and/or on the absence of material adverse information that was known to or recklessly disregarded by Defendants, but not disclosed in public statements by Defendants during the Class Period, Plaintiff and the other members of the Class acquired Volkswagen ADRs during the Class Period at artificially inflated high prices and were damaged thereby.

119.    At the time of said misrepresentations and omissions, Plaintiff and the other members of the Class were ignorant of their falsity, and believed them to be true.  Had Plaintiff and the other members of the Class and the marketplace known of the true performance, business

practices, future prospects and intrinsic value of Volkswagen, which were not disclosed by Defendants, Plaintiff and the other members of the Class would not have purchased or otherwise acquired Volkswagen ADRs during the Class Period, or, if they had acquired such ADRs during the Class Period, they would not have done so at the artificially inflated prices they paid.

120.    By virtue of the foregoing, Defendants violated §10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder.

121.    As a direct and proximate result of Defendants' wrongful conduct, Plaintiff and the other members of the Class suffered damages in connection with their purchases of the Company's ADRs during the Class Period.

## COUNT II

### For Violation of §20(a) of the Exchange Act
### Against the Individual Defendants

122.    Plaintiff repeats and realleges the allegations set forth above as if set forth fully herein. This claim is asserted against all of the Individual Defendants.

123.    The Individual Defendants were and acted as controlling persons of Volkswagen within the meaning of §20(a) of the Exchange Act as alleged herein.  By virtue of their high level positions with the Company, participation in and/or awareness of the Company's operations and/or intimate knowledge of the Company's actual performance, the Individual Defendants had the power to influence and control and did influence and control, directly or indirectly, the decision-making of the Company, including the content and dissemination of the various statements which Plaintiff contends are false and misleading. Each of the Individual Defendants was provided with or had unlimited access to copies of the Company's reports, press releases, public filings and other statements alleged by Plaintiff to be misleading prior to and/or shortly

after these statements were issued and had the ability to prevent the issuance of the statements or cause the statements to be corrected.

124.    In addition, each of the Individual Defendants had direct involvement in the day to-day operations of the Company and, therefore, is presumed to have had the power to control or influence the particular transactions giving rise to the securities violations as alleged herein, and exercised the same.

125.    As set forth above, Defendants violated §10(b) and Rule 10b-5 by their acts and omissions as alleged in this Complaint.  By virtue of their controlling positions, the Individual Defendants are liable pursuant to §20(a) of the Exchange Act. As a direct and proximate result of the Individual Defendants' wrongful conduct, Plaintiff and the other members of the Class suffered damages in connection with their purchases of the Company's ADRs during the Class Period.

**PRAYER FOR RELIEF**

WHEREFORE, Plaintiff, individually and on behalf of the Class, prays for relief and judgment, as follows:

A.    Declaring this action to be a class action pursuant to Rule 23(a) and (b)(3) of the Federal Rules of Civil Procedure on behalf of the Class defined herein;

B.    Awarding Plaintiff and the other members of the Class damages in an amount which may be proven at trial, together with interest thereon;

C.    Awarding Plaintiff and the other members of the Class pre-judgment and post judgment interest, as well as their reasonable attorneys' and experts' witness fees and other costs; and

D.    Awarding such other relief as this Court deems appropriate.

## JURY TRIAL DEMANDED

Plaintiff demands a trial by jury.

DATED:  November 13, 2015                Respectfully submitted,

/s/ Thomas C. Michaud
THOMAS C. MICHAUD (P46787)
MICHAEL J. VANOVERBEKE (P42641)
VANOVERBEKE MICHAUD & TIMMONY, P.C.
79 Alfred Street
Detroit, MI 48201
(313) 578-1200 Telephone
(313) 578-1201 Facsimile

JOE KENDALL
JODY RUDMAN
JAMIE J. MCKEY
MATTHEW G. RITTMAYER
KENDALL LAW GROUP, LLP
3232 McKinney, Ste. 700
Dallas, TX 75204
(214) 744-3000 Telephone
(214) 744-3015 Facsimile

ATTORNEYS FOR PLAINTIFFS